ELMORE, Judge.
 

 *479
 
 Defendant Jonathan Broyhill was convicted of first-degree murder for the death of Jamie Hahn, and attempted first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury against Nation Hahn. Defendant appeals, arguing that (1) the trial court erred in excluding the testimony of his psychiatrist, Dr. Badri Hamra, on the basis that Dr. Hamra's proffered testimony constituted expert opinion testimony which had not been disclosed pursuant to a reciprocal discovery order; (2) the trial court unduly restricted defendant's
 
 voir dire
 
 of prospective jurors concerning their ability to fairly assess the credibility of witnesses; and (3) the trial court erred in excluding defendant's two prior custodial statements while admitting the third statement into evidence at trial. Upon review, we conclude that defendant received a fair trial, free from error.
 

 I. Background
 

 On 20 May 2013, a Wake County Grand Jury indicted defendant on charges of first-degree murder, attempted first-degree murder, and assault with a deadly weapon with intent to kill inflicting serious injury. A jury trial was held at the 23 February 2015 Criminal Session of the Superior Court for Wake County, the Honorable Paul C. Ridgeway presiding. The State's evidence at trial tended to show the following:
 

 Defendant was a close friend to Nation and Jamie Hahn. He and Nation became friends after a church trip, when Nation was entering his freshman year of high school in Lenoir. Defendant had just graduated from the same school but Nation would often visit him at his job in a local paint store. After high school, Nation attended the University of North Carolina at Chapel Hill, where he met Jamie while both were volunteering for a presidential campaign. Nation and Jamie started dating and were eventually married. As with Nation, defendant and Jamie quickly became friends. Defendant even served as Nation's best man at the Hahns' wedding.
 

 *480
 
 In April 2010, Jamie hired defendant at her political consulting firm, Sky Blue Strategies. Sky Blue provided clients with a variety of campaign services, including strategy, fundraising, and compliance. U.S. Congressman Brad Miller hired Sky Blue the following year for his re-election campaign. Jamie focused on fundraising and strategy, while defendant handled Federal Elections Commission (FEC) compliance, managed campaign donations, and disbursed funds for campaign expenses. Defendant was a signatory on the campaign's bank account.
 

 In fall 2011, Congressman Miller suspended his re-election campaign, leading Sky Blue to shift its focus from fundraising toward issuing refund checks to donors. Due to the change in circumstances, defendant became primarily responsible for the remaining work on the campaign. Unbeknownst to Jamie, defendant wrote checks to himself out of the campaign account from June 2011 to March 2013. The checks totaled more than $46,500.
 

 Near the end of his employment with Sky Blue, defendant started to complain of various health issues. In August 2012, he told the Hahns he had Multiple Sclerosis and was seeking treatment. Defendant also reported problems with his gallbladder, claiming he
 
 *836
 
 had scheduled surgery to remove gallstones. In November or December 2012, defendant expressed to Jamie that, in light of his health problems, he would need to find a less stressful job. Recognizing that Sky Blue could no longer afford to pay defendant without revenue from the Miller campaign, Jamie agreed to help defendant find a job elsewhere.
 

 Jamie soon discovered that certain Miller campaign expenses had not been paid. Although he was no longer employed by Sky Blue, defendant continued to manage campaign finances and FEC quarterly reports. In early 2013, Jamie received inquiries from campaign staffers concerning delays in refund check disbursements. Defendant avoided Jamie's requests for information on the campaign finances, citing his preoccupation with the upcoming gallbladder surgery.
 

 Defendant eventually agreed to meet with Jamie at the Hahns' home on 8 April 2013 to draft the quarterly report due the following week. When he failed to show, defendant claimed he was working late at his new job with LabCorp, a job he did not have. Defendant agreed to reschedule their meeting for the next evening. Upon his arrival, defendant appeared "very weak, sort of white faced." He told Nation that doctors had discovered a spot when they removed his gallstones, a spot which they believed was pancreatic cancer. Stunned by the news, the Hahns spent the evening comforting defendant rather than drafting the report.
 

 *481
 
 Two days later, the Hahns arranged to take defendant to Duke Cancer Hospital to confirm his diagnosis. When defendant failed to meet at their home as planned, Nation and Jamie became concerned and drove to defendant's house. He answered the door "in a daze," claiming he overslept. At this point, defendant realized he would certainly miss the appointment. He pretended to call the hospital to reschedule for the next day and, at Jamie's suggestion, agreed to help with the quarterly report for the rest of the afternoon. Moments after arriving at the Hahns' home, defendant informed Jamie that he forgot to bring his computer. He left to retrieve it but never returned. Jamie made repeated attempts to contact defendant to no avail.
 

 When the Hahns finally heard from defendant the next morning, he told them he was at the beach. He said he had been fired from LabCorp, and with his "presumed cancer diagnosis," he "just needed to get away." Defendant apologized and assured Jamie that he would be back in time to prepare the quarterly report. The Hahns, meanwhile, had planned a week-long vacation at the beach to celebrate their anniversary and Nation's birthday. Jamie asked defendant to reschedule his doctor's appointment for 15 April 2013, so that she and Nation could attend before leaving for the beach.
 

 On Sunday, 14 April 2013, defendant purchased a large chef's knife before driving to the Hahns' residence to finalize the quarterly report with Jamie. He and Jamie met downstairs while Nation worked upstairs in his office. During their meeting, Jamie received a message from Nation informing her that, according the FEC website, the Miller campaign's 2012 fourth quarter report had never been filed. When pressed by Jamie, defendant assured her that he filed the report and had received confirmation via facsimile from the FEC.
 

 The next morning, Jamie and defendant met with Congressman Miller's campaign treasurer, John Wallace, to review the completed draft of the quarterly report. The report revealed a continuing indebtedness to Congressman Miller, a debt which Wallace believed had been retired. He requested that the draft be amended to reflect the debt as paid before the report was submitted to the FEC. At the time, a separate discrepancy in the draft report was overlooked. The report indicated that the campaign had $62,914.52 in cash at the end of the first quarter when, in fact, the campaign account had a negative balance of $3,587.06.
 

 After the meeting with Wallace, Nation and Jamie drove defendant to Duke Cancer Hospital for his appointment. Upon their arrival, the Hahns dropped defendant off at the entrance to check in while Nation
 
 *482
 
 and Jamie parked the car. When they reconvened inside, defendant said he had to go in for tests and the nurses would call the Hahns if needed. Nation and Jamie sat down in the lobby while defendant went through a set of double doors behind the reception desk. Defendant admitted to police that he did not have a
 
 *837
 
 doctor's appointment that day. He walked around the hospital for nearly two hours while the Hahns waited in the lobby. When he returned, defendant told them "he did indeed have pancreatic cancer but the doctors were hopeful."
 

 The Hahns drove defendant back to Raleigh before leaving for the beach. On the way out of town, Jamie received a call from Congressman Miller's office informing her that a check written from the campaign account had bounced. Based on the first quarter report, Jamie believed the campaign account had more than sufficient funds. She decided that the returned check must have been a mistake.
 

 On Wednesday, 17 April 2013, Wallace e-mailed Jamie and defendant about recent communications between the FEC and the Miller campaign. The FEC had requested additional information to address concerns over suspicious disbursements from the campaign account. The FEC had also informed the campaign that it had failed to timely file a report covering the last quarter of 2012. Defendant responded on the e-mail thread: "Good afternoon, John. I am working on this now, and I will be in touch." In light of defendant's prior assurances and his e-mail response, Jamie assumed that defendant had the issues under control. Defendant never followed up with Wallace.
 

 The Hahns returned from the beach the following Sunday. Shortly after midnight, defendant used Nation's credit card to purchase a one-way airline ticket from Charlotte to Las Vegas, departing Monday afternoon. He canceled his flight reservation one hour before take-off. Defendant opted instead to purchase a one-way train ticket from Raleigh to Charlotte, departing Tuesday morning.
 

 On Monday, 22 April 2013, defendant and Jamie met at the Hahns' home to finalize matters with Congressman Miller's campaign. In his backpack, defendant concealed the chef's knife he had recently purchased. Nation arrived home around 5:00 p.m. Jamie, he noticed, was on the phone in her office downstairs and defendant was walking through the kitchen. Nation greeted defendant with a hug and invited him to stay the night before another doctor's appointment in the morning. Defendant answered equivocally but added that "he had his clothes packed with him in case he did." After their brief conversation, Nation proceeded upstairs to change out of his work clothes and into his running gear.
 

 *483
 
 Shortly thereafter, Nation heard Jamie screaming from downstairs. He threw open the bedroom door and ran down the stairs shouting, "What's happening?" Jamie cried out, "He's trying to kill me." Nation rounded the corner of the staircase when he saw blood on the floor and defendant standing over Jamie with a knife. Nation shouted, "What the fuck are you doing?" Defendant said nothing as he turned and came at Nation, raising the knife in the air as he moved closer. Nation grabbed the blade with one hand and started striking defendant in the face with the other. As the struggle continued, Nation yelled at Jamie to get out of the house. Jamie, covered in blood, ran out the side door and collapsed in a neighbor's yard. After gaining separation from defendant, Nation followed Jamie out of the house while shouting for someone to call 9-1-1. Neighbors tended to Nation and Jamie until the ambulance arrived.
 

 Police surrounded the Hahns' home and ordered defendant to come outside. He exited the house calmly with his hands in the air. Officer Roy Smith observed self-inflicted knife wounds on defendant's wrists and a stab wound to his stomach. To Officer Smith, defendant's self-inflicted wounds were indicative of an attempted suicide. Officer Smith rode in the ambulance transporting defendant to the hospital. As EMS workers spoke with defendant, he became visibly upset and started weeping. He told them, "It's been a long time coming," and said repeatedly, "I just want to die."
 

 Jamie died in the hospital two days later as a result of her injuries. An autopsy revealed multiple stab wounds, including one to her torso which penetrated her liver, and another to her chest which penetrated her lung and severed an artery. Nation survived the attack with injuries to his hands, including a deep laceration which transected an artery, tendons, and nerves in two fingers on his left hand.
 

 While defendant was hospitalized, police conducted three custodial interviews on 23,
 
 *838
 
 25, and 26 April 2013, respectively. The State introduced the recording and transcript of the 26 April interview, which were published to the jury. Over defendant's objection, the court declined to admit transcripts of the 23 and 25 April interviews.
 

 During the 26 April 2013 interview, defendant admitted that he had embezzled money from the Miller campaign and had lied about his gallbladder surgery, his pancreatic cancer, and his appointments at Duke Cancer Hospital. Defendant also reported bouts with depression and thoughts of suicide, claiming he often heard voices telling him to hurt other people, he had bought the knife to hurt himself, and he had planned on traveling to Las Vegas to commit suicide. At his last meeting
 
 *484
 
 with Jamie, defendant anticipated a conversation about the discrepancies in the campaign account. When asked to describe his memory of that night, defendant recalled stabbing Jamie but did not recall attacking Nation or cutting himself.
 

 At trial, defendant offered testimony of his family members and a nurse psychotherapist, Susan Simon, who saw defendant for ten sessions between February and May 2012. Among other things, Ms. Simon testified that during the sessions defendant expressed feelings of worthlessness and depression. Upon the State's objections, the court refused to admit the proffered testimony of Dr. Badri Hamra, a psychiatrist with the North Carolina Department of Public Safety, who treated defendant fifteen months after his arrest.
 

 At the conclusion of trial, the jury found defendant guilty of first-degree murder, attempted first-degree murder, and assault with a deadly weapon with intent to kill inflicting serious injury. The trial court sentenced defendant to a term of life in prison without parole, and consecutive terms of 157 to 201 months and 73 to 100 months. Defendant entered notice of appeal in open court.
 

 II. Discussion
 

 A. Discoverable Expert Opinion Testimony
 

 Defendant first argues that the trial court erred in excluding the proffered testimony of Dr. Hamra. After
 
 voir dire
 
 , the court determined that Dr. Hamra was rendering expert opinion testimony, thereby triggering the discovery requirements of N.C. Gen. Stat. § 15A-905(c)(2). Because defendant failed to disclose Dr. Hamra as an expert witness pursuant to the reciprocal discovery order, the court did not allow Dr. Hamra to testify at trial. The court also concluded, in the alternative, that Dr. Hamra's testimony was not relevant, and if it was, the probative value of his testimony was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. Defendant maintains that Dr. Hamra was testifying as a fact witness, outside the scope of the reciprocal discovery order, and the testimony was relevant to the issue of premeditation and deliberation, such that the court's decision to exclude it constitutes reversible error.
 

 Rule 702(a) of the North Carolina Rules of Evidence provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise...."
 

 *485
 
 N.C. Gen. Stat. § 8C-1, Rule 702(a) (2015). An expert's testimony relies upon "scientific, technical or other specialized knowledge" to "provide insight beyond the conclusions that jurors can readily draw from their ordinary experience."
 
 State v. McGrady
 
 ,
 
 368 N.C. 880
 
 , 889,
 
 787 S.E.2d 1
 
 , 8 (2016). Lay testimony, by contrast, is based on personal knowledge of facts "which can be perceived by the senses." N.C. Gen. Stat. § 8C-1, Rule 602 cmt. (2015);
 
 see also
 
 N.C. Gen. Stat. § 8C-1, Rule 701 (2015) (providing that lay opinion testimony is limited to opinions which are "rationally based on the perception of the witness"). A lay witness may state " 'instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things,
 
 derived from observation of a variety of facts presented to the senses at one and the same time
 
 .' "
 
 State v. Leak
 
 ,
 
 156 N.C. 643
 
 , 647,
 
 72 S.E. 567
 
 , 568 (1911)
 
 [1]
 
 (emphasis added) (quoting
 
 *839
 
 John Jay McKelvey,
 
 Handbook of the Law of Evidence
 
 § 132 (rev. 2d ed. 1907) ),
 
 quoted in
 

 State v. Stager
 
 ,
 
 329 N.C. 278
 
 , 321,
 
 406 S.E.2d 876
 
 , 901 (1991).
 

 Our Supreme Court recently explained the threshold difference between expert opinion and lay witness testimony: "[W]hen an expert witness moves beyond reporting what he saw or experienced through his senses, and turns to interpretation or assessment 'to assist' the jury based on his 'specialized knowledge,' he is rendering an expert opinion."
 
 State v. Davis
 
 ,
 
 368 N.C. 794
 
 , 798,
 
 785 S.E.2d 312
 
 , 315 (2016) (footnote omitted) (quoting N.C. Gen. Stat. § 8C-1, Rule 702(a) );
 
 see also
 
 David P. Leonard,
 
 The New Wigmore: Expert Evidence
 
 § 2.6 (2009) ("[W]hile an expert relies on scientific, technical, or other specialized knowledge, lay testimony is based solely on the perception of the witness.... Application of specialized knowledge from whatever source would bring the testimony within the sphere of expertise." (footnote omitted) (internal quotation marks omitted)).
 

 Ultimately, "what constitutes expert opinion testimony requires a case-by-case inquiry" through an examination of "the testimony as a whole and in context."
 
 Davis
 
 , 368 N.C. at 798,
 
 785 S.E.2d at 315
 
 . We review
 
 de novo
 
 the trial court's conclusion that Dr. Hamra's proffered testimony constitutes discoverable expert opinion testimony.
 
 See
 

 id.
 
 at 797-98,
 
 785 S.E.2d at 314-15
 
 (applying
 
 de novo
 
 review to determine "whether the State's expert witnesses gave opinion testimony so as to trigger the discovery requirements under section 15A-903(a)(2)").
 

 *486
 
 " 'Under a
 
 de novo
 
 review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal."
 
 State v. Williams
 
 ,
 
 362 N.C. 628
 
 , 632-33,
 
 669 S.E.2d 290
 
 , 294 (2008) (quoting
 
 In re Appeal of The Greens of Pine Glen Ltd. P'ship
 
 ,
 
 356 N.C. 642
 
 , 647,
 
 576 S.E.2d 316
 
 , 319 (2003) ).
 

 During
 
 voir dire
 
 , defendant elicited the following testimony from Dr. Hamra:
 

 Q. As a psychiatrist, do you ever prescribe medication for an inmate if you believe that it will help them to deal with any mental health issues they may be dealing with?
 

 A. Yes, sir.
 

 ....
 

 Q. When you treated Mr. Broyhill, did you prescribe any medications for him to take to deal with his mental health issues?
 

 A. Yes, I did.
 

 Q. Among the medications that you prescribed for Mr. Broyhill, were any of them for anxiety, depression, or psychosis ?
 

 A. All of them were.
 

 Q. Could you please tell us what medications you prescribed for Mr. Broyhill when he was your patient.
 

 A. There are four medications given to him. One is called Effexor XR.... The next one is Zoloft.... The third one is Buspar.... And the last one is Risperdal....
 

 ....
 

 Q. Even though you review a patient's past summary, do you still make your own evaluation as to whether that patient is in need of medication?
 

 A. That is my job, sir.
 

 ....
 

 Q. Did your review of the medical summary that was provided indicate that he had been on psychiatric medications prior to coming into your care?
 

 *487
 
 A. Yes, he was.
 

 ....
 

 Q. When a patient gets transferred from one facility to another, does that patient continue to get psychiatric medications that had been prescribed for him at the previous facility?
 

 A. He will be automatically on them until he sees the doctor, which is in case me [sic], and then I make a decision whether to keep them or change them.
 

 Q. And then if you decide to change it, at that point, you can change it?
 

 A. Oh, absolutely, yes.
 

 Q. Is this what happened in Mr. Broyhill's case?
 

 A. No, sir. He stayed on the same medications.
 

 Q. Did he stay-did he continue to receive psychiatric medications until you were able to see him yourself?
 

 *840
 
 A. Yes.
 

 Q. After you saw him, you continued him on these medications?
 

 A. Yes, I did.
 

 ....
 

 Q. ... Dr. Hamra, to your knowledge and based upon the records you reviewed, is it fair to say that since his arrest Mr. Broyhill has been held in custody as a safekeeper and has consistently been prescribed psychiatric medications for his mental health needs?
 

 A. Yes, sir.
 

 Q. Would you prescribe these types of medications for an inmate if they didn't need it?
 

 A. That would be unprofessional, sir.
 

 Q. In the present system, do inmates sometimes request a psychiatric medication even though they might not suffer from a mental illness?
 

 *488
 
 A. Sometimes that happens, yes.
 

 Q. Would you prescribe a medication for an inmate simply because they asked for it?
 

 A. I hope not. I don't.
 

 Q. Would there have to be a legitimate medical reason for prescribing a patient a psychiatric medication?
 

 A. That's the way it should be.
 

 Based on the foregoing, we agree with the trial court that Dr. Hamra intended to offer expert opinion testimony. He testified in no uncertain terms that defendant had a psychiatric condition for which he, Dr. Hamra, prescribed medication. He then clarified that his decision to prescribe medication was based not merely on his review of defendant's medical history but on his own evaluation of defendant. Finally, he confirmed that he would only have prescribed medication for "a legitimate medical reason," dismissing the notion that he would write a prescription simply because defendant asked him to do so.
 

 As the Supreme Court concluded in
 
 Davis
 
 , it is immaterial that Dr. Hamra's testimony was not elicited through the typical question: " 'Doctor, do you have an opinion?' "
 
 Davis
 
 , 368 N.C. at 802,
 
 785 S.E.2d at 317
 
 . His testimony was tantamount to a diagnosis, which requires the application of specialized knowledge to his observations of defendant, and which ventures beyond simply "reporting what he saw or experienced through his senses."
 
 Id.
 
 at 798,
 
 785 S.E.2d at 315
 
 . And while defendant argued at trial that the testimony was offered not as proof of diminished capacity but to show he was truthful with police about his mental faculties, the relevance of the latter still rests upon Dr. Hamra's psychiatric evaluation.
 

 Assuming
 
 arguendo
 
 that Dr. Hamra was not testifying as an expert, the trial court nevertheless acted within its discretion by excluding his testimony under Rule 403. "The admissibility of evidence is governed by a threshold inquiry into its relevance."
 
 State v. Griffin
 
 ,
 
 136 N.C. App. 531
 
 , 550,
 
 525 S.E.2d 793
 
 , 806 (2000) (citation omitted). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2015). The trial court is in the best position to evaluate relevance.
 
 Dunn v. Custer
 
 ,
 
 162 N.C. App. 259
 
 , 266,
 
 591 S.E.2d 11
 
 , 17 (2004). While its rulings on relevance are not entirely discretionary, such rulings are afforded "great deference on appeal."
 

 Id.
 

 *489
 
 Even if relevant, evidence may nevertheless "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2015). Whether relevant evidence satisfies the Rule 403 balancing test is a discretionary ruling reviewed on appeal for abuse of discretion.
 
 State v. Beckelheimer
 
 ,
 
 366 N.C. 127
 
 , 130,
 
 726 S.E.2d 156
 
 , 159 (2012). An abuse of discretion occurs "where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Hennis
 
 ,
 
 323 N.C. 279
 
 , 285,
 
 372 S.E.2d 523
 
 , 527 (1988) (citation omitted).
 

 Dr. Hamra first met with defendant fifteen months after defendant's arrest. He reviewed a summary of defendant's medical records from Raleigh's Central Prison, but it is not clear whether Dr. Hamra had access to records of defendant's treatment before his
 
 *841
 
 arrest. Although his diagnosis and treatment may have
 
 some
 
 probative value, bearing on defendant's state of mind and credibility, Dr. Hamra's testimony does not speak directly to defendant's condition at the time of Jamie Hahn's death.
 

 To the extent that it was relevant, there was a substantial risk that the testimony would unfairly prejudice the State, mislead the jury, and result in confusion of the issues. As the trial court aptly explained in its order:
 

 [T]he naked testimony of Dr. Hamra that medications were required and helpful to the Defendant in July 2014, without being subjected to the strictures of Rule 702, would have the substantial likelihood of confusing the issues of this case, misleading the jury, and would invite the jury to speculate the nature of these medication[s], the nature of the conditions these medications are used to treat, the reliability of the diagnosis, the duration of the condition(s), and the effect of these conditions on the Defendant's state of mind and credibility at any time relevant to the alleged criminal conduct.
 

 Defendant offered Dr. Hamra's testimony without evidence of his credentials, the medical reports he reviewed, the results of any examinations he performed, or the underlying basis for his opinions. To admit the testimony without the required prior disclosure would have deprived the State of effective cross-examination and hindered the trial court's ability to fulfill its gatekeeping obligations under Rule 702. Both the court and the State would have been left to accept Dr. Hamra's evaluation at face value.
 

 *490
 
 Because Dr. Hamra's proffered testimony constituted expert opinion testimony, which defendant failed to disclose pursuant to the reciprocal discovery order, the trial court did not err in excluding the testimony at trial. Alternatively, even if Dr. Hamra was testifying as a fact witness, the trial court did not abuse its discretion in excluding his testimony under Rule 403. The probative value of the testimony was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury.
 

 B.
 
 Voir Dire
 
 of Prospective Jurors
 

 Defendant next argues that the trial court erred during jury selection by unduly restricting defendant's inquiry into whether prospective jurors could fairly evaluate credibility if faced with evidence that a person had lied in the past.
 

 The primary goal of jury selection "is to empanel an impartial and unbiased jury."
 
 State v. Garcia
 
 ,
 
 358 N.C. 382
 
 , 407,
 
 597 S.E.2d 724
 
 , 743 (2004) (citations omitted). A defendant is entitled to a jury composed of members "free from a preconceived determination to vote contrary to [the defendant's] contention concerning [his] guilt of the offense for which he is being tried."
 
 State v. Williams
 
 ,
 
 286 N.C. 422
 
 , 427-28,
 
 212 S.E.2d 113
 
 , 117 (1975) (citing
 
 Witherspoon v. Illinois
 
 ,
 
 391 U.S. 510
 
 ,
 
 88 S.Ct. 1770
 
 ,
 
 20 L.Ed.2d 776
 
 (1968) ). As an appropriate means to that end, "counsel may question prospective jurors concerning their fitness or competency to serve as jurors to determine whether there is a basis to challenge for cause or whether to exercise a peremptory challenge."
 
 State v. Fullwood
 
 ,
 
 343 N.C. 725
 
 , 733,
 
 472 S.E.2d 883
 
 , 886-87 (1996) (citing N.C. Gen. Stat. § 15A-1214(c) (1988) ),
 
 cert. denied
 
 ,
 
 520 U.S. 1122
 
 ,
 
 117 S.Ct. 1260
 
 ,
 
 137 L.Ed.2d 339
 
 (1997).
 

 Counsel may not, however, "ask questions that use hypothetical evidence or scenarios to attempt to 'stake-out' prospective jurors and cause them to pledge themselves to a particular position in advance of the actual presentation of the evidence."
 
 State v. Fletcher
 
 ,
 
 348 N.C. 292
 
 , 308,
 
 500 S.E.2d 668
 
 , 677 (1998) (citations omitted);
 
 see also
 

 State v. Vinson
 
 ,
 
 287 N.C. 326
 
 , 336,
 
 215 S.E.2d 60
 
 , 68 (1975) ("Counsel may not pose hypothetical questions designed to elicit in advance what the juror's decision will be under a certain state of the evidence or upon a given state of facts."),
 
 sentence vacated on other grounds
 
 ,
 
 428 U.S. 902
 
 ,
 
 96 S.Ct. 3204
 
 ,
 
 49 L.Ed.2d 1206
 
 (1976). These "stakeout" questions are improper because they cause a juror "to pledge himself to a decision in advance of the evidence to be presented."
 
 State v. Jones
 
 ,
 
 339 N.C. 114
 
 , 134,
 
 451 S.E.2d 826
 
 , 835 (1994) (citing
 
 *491
 

 Vinson
 
 ,
 
 287 N.C. at 336
 
 ,
 
 215 S.E.2d at
 
 68 );
 
 see also
 

 State v. Simpson
 
 ,
 
 341 N.C. 316
 
 , 336,
 
 462 S.E.2d 191
 
 , 202 (1995) ("[T]he parties should not be able to elicit in advance what the jurors' decision will be
 
 *842
 
 under a certain set of facts. This type of 'staking out' is improper." (citations omitted)). It is also improper for counsel to ask "[q]uestions that seek to indoctrinate prospective jurors regarding potential issues before the evidence has been presented and jurors have been instructed on the law."
 
 State v. Richmond
 
 ,
 
 347 N.C. 412
 
 , 425,
 
 495 S.E.2d 677
 
 , 683-84 (1998) (citing
 
 State v. Parks
 
 ,
 
 324 N.C. 420
 
 , 423,
 
 378 S.E.2d 785
 
 , 787 (1989) ).
 

 While the law affords counsel "wide latitude" in the
 
 voir dire
 
 of prospective jurors, "the form and extent of the inquiry rests within the sound discretion of the court."
 
 State v. Johnson
 
 ,
 
 317 N.C. 343
 
 , 382,
 
 346 S.E.2d 596
 
 , 618 (1986) (citations omitted). "[T]o show reversible error in the trial court's regulation of jury selection, a defendant must show that the court abused its discretion and that he was prejudiced thereby."
 
 State v. Lee
 
 ,
 
 335 N.C. 244
 
 , 268,
 
 439 S.E.2d 547
 
 , 559 (citations omitted),
 
 cert. denied
 
 ,
 
 513 U.S. 891
 
 ,
 
 115 S.Ct. 239
 
 ,
 
 130 L.Ed.2d 162
 
 ,
 
 reh'g denied
 
 ,
 
 513 U.S. 1035
 
 ,
 
 115 S.Ct. 624
 
 ,
 
 130 L.Ed.2d 532
 
 (1994). A defendant's "right to an adequate
 
 voir dire
 
 to identify unqualified jurors does not give rise to a constitutional violation unless the trial court's exercise of discretion in preventing a defendant from pursuing a relevant line of questioning renders the trial fundamentally unfair."
 
 Fullwood
 
 ,
 
 343 N.C. at 732-33
 
 ,
 
 472 S.E.2d at
 
 887 (citing
 
 Morgan v. Illinois
 
 ,
 
 504 U.S. 719
 
 , 730 n.5,
 
 112 S.Ct. 2222
 
 , 2230 n.5,
 
 119 L.Ed.2d 492
 
 , 503 n.5 (1992) ;
 
 Mu'Min v. Virginia
 
 ,
 
 500 U.S. 415
 
 , 425-26,
 
 111 S.Ct. 1899
 
 , 1905-06,
 
 114 L.Ed.2d 493
 
 , 506 (1991) ).
 

 In this case, the trial court sustained several objections by the State to defendant's line of questioning concerning credibility:
 

 [DEFENSE COUNSEL]: ....
 
 People who lie, does that necessarily mean that they lie about everything?
 

 [PROSECUTOR]: Well, objection.
 

 THE COURT: Sustained.
 

 [DEFENSE COUNSEL]:
 
 If you hear testimony ... about a person lying, does that diminish all their credibility on everything?
 

 [PROSECUTOR]: Objection.
 

 THE COURT: Sustained.
 

 *492
 
 [DEFENSE COUNSEL]: Wish to be heard.
 

 THE COURT: It's a stakeout question so it's sustained.
 

 (Emphasis added.) The trial court later explained: "[M]any of the questions are stakeout questions, a number of which have been objected to and a number of which have not been objected to. Those are impermissible in
 
 voir dire
 
 ." In particular, the court expressed concern over defendant's questions which "described a set of facts and then [ ] asked the jurors to indicate how they would view that set of facts."
 

 Before resuming
 
 voir dire
 
 , the court requested that defendant use the pattern jury instructions to guide his line of questioning. The pattern jury instruction on the credibility of a witness provides:
 

 You are the sole judges of the believability of (a) witness(es).
 

 You must decide for yourselves whether to believe the testimony of any witness. You may believe all, any part, or none of a witness's testimony.
 

 In deciding whether to believe a witness you should use the same tests of truthfulness that you use in your everyday lives. Among other things, these tests may include: the opportunity of the witness to see, hear, know, or remember the facts or occurrences about which the witness testified; the manner and appearance of the witness; any interest, bias, prejudice or partiality the witness may have; the apparent understanding and fairness of the witness; whether the testimony is reasonable; and whether the testimony is consistent with other believable evidence in the case.
 

 N.C.P.I.-Crim. 101.15 (2011) (emphasis added).
 

 When compared to the pattern jury instructions, defendant's rejected line of questioning did not "amount[ ] to a proper inquiry as to whether the jury could follow the law or 'whether the juror would be able to follow the trial court's instructions.' "
 
 State v. Hill
 
 ,
 
 331 N.C. 387
 
 , 404,
 
 417 S.E.2d 765
 
 , 772 (1992) (quoting
 
 State v. Phillips
 
 ,
 
 300 N.C. 678
 
 , 682,
 
 268 S.E.2d 452
 
 , 455 (1980) ). Under the pattern instructions, a juror may choose to "believe
 
 *843
 
 all, any part, or none of a witness's testimony." N.C.P.I.-Crim. 101.15. Defendant, however, was concerned solely with whether a juror was likely to believe "none of a witness's testimony." He sought to discover what a prospective juror's decision would be under
 
 *493
 
 a set of circumstances-in particular, knowledge that defendant had embezzled money and lied about his health. In other words, defendant attempted to stakeout prospective jurors based on their likelihood to discredit evidence favorable to the defense upon learning that defendant had lied in the past.
 

 The trial court also sustained objections to another, similar line of questioning by defendant:
 

 [DEFENSE COUNSEL]:
 
 Have you ever known people to lie to get attention?
 

 [PROSECUTOR]: Objection.
 

 THE COURT: Sustained.
 

 [DEFENSE COUNSEL]:
 
 Can you consider the possibility that people would lie to get attention, not necessarily people you know?
 

 [PROSECUTOR]: Objection.
 

 THE COURT: Sustained.
 

 [DEFENSE COUNSEL]:
 
 Is lying to get attention one of the things that you would consider as a juror in evaluating evidence?
 

 PROSPECTIVE JUROR NO. 6: Yes.
 

 [DEFENSE COUNSEL]: How about you ...?
 

 PROSPECTIVE JUROR NO. 5: Yes.
 

 [DEFENSE COUNSEL]: In evaluating that lie, would you evaluate it not only for whether it is for that or whether it's-whether the lie is logical, whether it makes sense.
 

 [PROSECUTOR]: Objection.
 

 [DEFENSE COUNSEL]: Or it's something someone would expect to be believed?
 

 THE COURT: Sustained.
 

 (Emphasis added.)
 

 The trial court explained, and we agree, that the foregoing questions "tend[ed] to indoctrinate the jury to a particular point of view, which is also not permissible in
 
 voir dire
 
 ." Defendant was aware of the State's
 
 *494
 
 intention to offer evidence that defendant had lied about his health on several occasions. His line of questioning indicates an attempt to plant a seed in the minds of prospective jurors-that is, any lie defendant may have told was told to get attention. In their objected form, the questions posed a distinct risk that jurors would be inclined to view the evidence bearing on credibility through the lens provided by defendant at
 
 voir dire
 
 .
 

 In any event, defendant was still "allowed to ask other questions to achieve the same inquiry sought by ... the questions to which the court sustained the State's objection[s]."
 
 State v. Larry
 
 ,
 
 345 N.C. 497
 
 , 510,
 
 481 S.E.2d 907
 
 , 914 (1997) (citing
 
 State v. Bishop
 
 ,
 
 343 N.C. 518
 
 , 534-35,
 
 472 S.E.2d 842
 
 , 850 (1996),
 
 cert. denied
 
 ,
 
 519 U.S. 1097
 
 ,
 
 117 S.Ct. 779
 
 ,
 
 136 L.Ed.2d 723
 
 (1997) ). Defendant resumed his line of questioning in a manner consistent with the pattern jury instructions. And as the State points out, several prospective jurors demonstrated a nuanced understanding of how they should evaluate credibility.
 

 Based on the foregoing, we conclude that the trial court did not abuse its discretion by restricting defendant's
 
 voir dire
 
 examination of prospective jurors. The court properly sustained objections to defendant's improper stakeout questions and questions tending to indoctrinate the jurors. In addition, the court did not close the door on defendant's inquiry into whether the prospective jurors could fairly assess credibility. Rather, defendant was permitted to ask similar questions in line with the pattern jury instructions, which were an adequate proxy to gauge a prospective juror's ability to fairly assess credibility at trial.
 

 C. Exclusion of Custodial Interview Statements
 

 Finally, defendant argues that the trial court erred in excluding statements from his custodial interviews on 23 and 25 April 2013, while admitting statements from his third custodial interview on 26 April 2013. In its ruling, defendant contends, the court improperly placed a burden upon defendant to show how the third statement was "out of context," and how the two prior statements were "explanatory or relevant." Although he
 
 *844
 
 acknowledges there was no substance to his second statement, as he refused to answer questions during the interview, defendant maintains that his two prior statements should have been admitted under Rule 106 because they would have enhanced the jury's understanding of the third.
 

 Pursuant to Rule 106 of the North Carolina Rules of Evidence, when a party introduces "a writing or recorded statement or part thereof ..., an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."
 

 *495
 
 N.C. Gen. Stat. § 8C-1, Rule 106 (2015). Rule 106 "is an expression of the rule of completeness."
 

 Id.
 

 cmt. (quoting Fed. R. Evid. 106 advisory committee's note). It "codifies the standard common law rule that when a writing or recorded statement or a part thereof is introduced by any party, an adverse party can obtain admission of the entire statement or anything so closely related that in fairness it too should be admitted."
 
 State v. Thompson
 
 ,
 
 332 N.C. 204
 
 , 219-20,
 
 420 S.E.2d 395
 
 , 403 (1992). The purpose of the rule "is merely to ensure that a misleading impression created by taking matters out of context is corrected on the spot," due to "the inadequacy of repair work when delayed to a point later in the trial."
 
 Id.
 
 at 220,
 
 420 S.E.2d at 403-04
 
 (citations and internal quotation marks omitted);
 
 see also
 
 N.C. Gen. Stat. § 8C-1, Rule 106 cmt. (explaining the two considerations upon which Rule 106 is based).
 

 As
 
 Thompson
 
 instructs, defendant had to demonstrate that the third statement was "somehow out of context" when it was introduced into evidence, and that the two prior statements were "either explanatory of or relevant to" the third.
 
 Thompson
 
 ,
 
 332 N.C. at 220
 
 ,
 
 420 S.E.2d at
 
 404 ;
 
 see, e.g.
 
 ,
 
 State v. Castrejon
 
 ,
 
 179 N.C. App. 685
 
 , 692-93,
 
 635 S.E.2d 520
 
 , 524-25 (2006) (holding that the trial court did not err by excluding the defendant's exculpatory statements while admitting testimony that he gave a false name to police, where the defendant failed to show that the testimony "was taken out of context" or the exculpatory statements were "explanatory of or relevant to" the testimony).
 

 We review the trial court's ruling pursuant to Rule 106 for abuse of discretion.
 
 Thompson
 
 ,
 
 332 N.C. at 220
 
 ,
 
 420 S.E.2d at 403
 
 (citation omitted);
 
 see also
 

 State v. Fowler
 
 ,
 
 353 N.C. 599
 
 , 620,
 
 548 S.E.2d 684
 
 , 699 (2001) ("[W]hether evidence should be excluded ... under the common law rule of completeness codified in Rule 106 is within the trial court's discretion." (citations omitted)).
 

 Contrary to defendant's assertion, the trial court correctly applied Rule 106 in its decision to exclude the first two statements at trial. After reviewing all three recorded statements and comparing the contents thereof, the court concluded that defendant made no statement during the first or second interview "that under Rule 106 ought, in fairness, to be considered contemporaneously with the statements of April 26." The court found "no instance where the statements in the April 26 interview require further explanation by any excerpts from the April 23 or the April 25 interview," and "no instance where the statements in the [April 26] interview were rendered out of context or misleading in the absence of excerpts from the April 23 or April 25 interview." Defendant harps on the "temporal connection and interrelated nature" of the statements but
 
 *496
 
 fails to explain precisely how the first two statements would "enhance the jury's understanding" of the third. And upon our review of the interview transcripts, we conclude defendant has failed to show that the court abused its discretion in excluding defendant's first two statements at trial.
 

 III. Conclusion
 

 Defendant received a fair trial, free from error. The trial court properly concluded that Dr. Hamra's proffered testimony constituted expert opinion testimony which defendant failed to disclose pursuant to the reciprocal discovery order. Even if Dr. Hamra was testifying as a lay witness, the court acted within the bounds of its discretion by excluding his testimony under Rule 403 in that the probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. The court exercised the same, appropriate level of discretion at jury selection by sustaining the
 
 *845
 
 State's objections to questions designed to stakeout and indoctrinate prospective jurors, and by restricting defendant's
 
 voir dire
 
 to a proper inquiry in line with the pattern instructions on witness credibility. Finally, we conclude that the trial court did not abuse its discretion by excluding defendant's two prior interview statements from evidence at trial. Our review of the two prior interview transcripts reveals no statement which, in fairness, should have been considered contemporaneously with the third.
 

 NO ERROR.
 

 Judges TYSON and BERGER concur.
 

 [1]
 

 We have maintained the predominant citation to the North Carolina Reports, for the sake of consistency, but include the correct citation for those individuals referencing the bound volumes:
 
 State v. Leak
 
 ,
 
 156 N.C. 518
 
 , 521 (1911).