DAVIS, Judge.
Michelle Smith White ("Defendant") appeals from the trial court's order requiring her to submit to satellite-based monitoring ("SBM") for a period of ten years. Because prior decisions from this Court mandate the conclusion that the State failed to meet its burden of showing that the imposition of SBM was a reasonable search under the Fourth Amendment as to Defendant, we reverse.
Factual and Procedural Background
In 2011, Defendant was working as a dance teacher at Jordan High School in Durham, North Carolina. She was married and had three young children.
During the 2011-2012 school year, a fourteen-year-old freshman student ("Jan")[1] began taking dance classes with Defendant. After Jan turned fifteen years old, Defendant began texting and emailing her frequently. By the end of her freshman year, Defendant's "texting and e-mailing [Jan] became pretty much a daily occurrence."
Jan's father learned about Defendant's communications with his daughter at the end of her freshman year and became concerned with the "abnormal amount of attention and extra time being spent with [Jan]." He requested that Defendant maintain a normal relationship with Jan. Defendant repeatedly told Jan's father that she would abide by his request, but she nevertheless continued to text and email Jan frequently.
Early in her sophomore year, Jan's father discovered a "highly inappropriate ... love letter" from Defendant that had fallen out of Jan's pocket. He returned the letter to Defendant and told her to stay away from Jan. Jan's parents wrote out specific guidelines for Defendant that included "not being alone together with my daughter, ... not buying her gifts or trinkets, ... not showing her extra attention, but just to basically have a professional relationship of a student and a teacher, but to basically cease with the-what we felt was too much attention or constant requests to try and get time with my daughter, away from us."
Over the next few years, Defendant and Jan would meet secretly at Jan's home, Defendant's home, Jordan High School, and Defendant's vehicle. Three separate investigations were conducted to determine the extent of the relationship between Defendant and Jan. During her junior year, Jan's parents discovered "a picture of [Defendant] in an intimate kiss with our daughter that was highly inappropriate ...." At the close of the third investigation in April 2014, Defendant was removed from her position at Jordan High School.
After Defendant's employment was terminated, Jan's father's attorney sent her a note demanding that she "no longer have any further contact with [Jan], or that further actions ... would be taken." Despite this note, Defendant continued emailing and texting. They continued to see one another in person, including in the restroom at a CVS drug store near Jordan High School and at a Michael's store where Jan was working. Jan's father eventually learned that Defendant had gotten a tattoo of Jan's face on her back, was "soliciting [Jan] for threesomes with her husband[,]" and was "talking about going to ... San Francisco, for a lesbian trip with [Jan]."
On 16 March 2015, Defendant was indicted for engaging in sexual activity with a student and taking indecent liberties with a student. She was subsequently indicted for two counts of taking indecent liberties with a minor and second-degree kidnapping.
On 2 September 2016, Defendant pled guilty to all of these offenses before the Honorable Orlando F. Hudson in Durham County Superior Court. That same day, the trial court consolidated three of the offenses and sentenced Defendant to a term of 20 to 33 months imprisonment and then consolidated the remaining offenses and imposed a consecutive sentence of 25 to 90 months imprisonment. Defendant was required to register as a sex offender for thirty years. The court also entered a permanent no-contact order, prohibiting Defendant from contacting or communicating with Jan or her family for the remainder of Defendant's life.
On 28 July 2017, a hearing was held to determine whether Defendant was eligible for SBM. The State presented testimony from Jan, Jan's father, Robert Viohl (a probation officer), and Michael Teague (a psychologist who worked with sex offenders in North Carolina). The State also provided evidence that based on her OTI-R assessment[2] Defendant posed a "minimal" risk of re-arrest.
On 16 August 2017, the trial court entered an order (the "SBM Order") requiring Defendant to enroll in SBM for ten years. Defendant filed a notice of appeal from the SBM Order.
Analysis
On appeal, Defendant contends that the trial court erred by (1) allowing the State to introduce expert testimony at the SBM hearing despite its failure to provide Defendant with prior notice of the nature of the opinions it intended to offer; (2) determining that Defendant required the highest level of supervision and monitoring so as to warrant the imposition of SBM; (3) concluding that the imposition of SBM for a period of ten years was a reasonable search under the Fourth Amendment; and (4) imposing SBM in violation of the "General Warrants" clause of the North Carolina Constitution. Because we find it to be dispositive of this appeal, we first address Defendant's argument that the State failed to demonstrate that the imposition of SBM was reasonable under the Fourth Amendment in light of the United States Supreme Court's decision in Grady v. North Carolina , --- U.S. ----, 135 S. Ct. 1368, 191 L.Ed. 2d 459 (2015) (hereinafter "Grady I ").
The United States Supreme Court held in Grady I that North Carolina's SBM program constitutes a search for purposes of the Fourth Amendment. Id. at ----, 135 S. Ct. at 1371, 191 L.Ed. 2d at 462. As a result, "North Carolina courts must first examine whether the State's monitoring program is reasonable-when properly viewed as a search-before subjecting a defendant to its enrollment." State v. Greene , --- N.C. App. ----, ----, 806 S.E.2d 343, 344 (2017) (citation and quotation marks omitted). "This reasonableness inquiry requires the court to analyze the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." Id. at ----, 806 S.E.2d at 344 (citation and quotation marks omitted).
In Greene , this Court determined that the State had failed to present sufficient evidence showing the reasonableness of SBM as to the defendant in that case under the Fourth Amendment. Id. at ----, 806 S.E.2d at 344. The State conceded its error and acknowledged in its appellate brief that its evidence was "too scant to satisfy its burden under the requirements of Grady ." Id. at ----, 806 S.E.2d at 345. We held not only that the trial court's SBM order was improper but also that the State was not entitled to a "second bite at the apple" in terms of a new SBM hearing. See id. at ----, 806 S.E.2d at 345.
In State v. Grady , --- N.C. App. ----, --- S.E.2d ---- (filed May 15, 2018) (No. COA17-12 ) (hereinafter "Grady II "),[3] this Court recently reviewed for the first time the validity of an SBM order that expressly sought to comply with the United States Supreme Court's mandate in Grady I . In that case, the trial court conducted an SBM hearing during which the State presented testimony from a probation officer who described the manner in which the defendant's ankle monitor would impact his everyday life and track his movements. The State also filed a "Memorandum In Support of the Reasonableness of Satellite Based Monitoring" that "offered arguments about the dangers of recidivism and the State's interest in protecting the public from sex offenders." Id. at ----, --- S.E.2d at ----, slip op. at 3, 7. The State's arguments in its memorandum consisted of references to case law from other jurisdictions and did not present statistics, expert testimony, or other comparable evidence regarding the efficacy of the SBM program in North Carolina. See id. at ----, --- S.E.2d at ----, slip op. at 3, 7, 19-20. In concluding that the imposition of SBM was reasonable, the trial court "heavily relied" on a decision from another jurisdiction where the court had "upheld lifetime GPS monitoring ...." Id. at ----, --- S.E.2d at ----, slip op. at 17.
On appeal, we held that Grady I required the trial court to look at "the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations." Id. at ----, --- S.E.2d at ----, slip op. at 5 (citing Grady I , --- U.S. at ----, 135 S. Ct. at 1371, 191 L.Ed. 2d at 463 ). We concluded that the State had failed to present sufficient evidence to demonstrate that SBM constituted a reasonable search, stating as follows:
[H]ere, the State failed to present any evidence concerning its specific interest in monitoring defendant, or of the general procedures used to monitor unsupervised offenders. Instead, the State submitted copies of the two sex offense judgments and defendant's criminal record, arguing that defendant himself was "Exhibit Number 1" of SBM's success in deterring recidivists, because "since he's been monitored, guess what: He hasn't recommitted, he hasn't been charged with another sex offense." However, Officer Pace, the State's sole witness, testified that the [electronic monitoring device] cannot actually prevent an offense from occurring. And although knowledgeable about the [electronic monitoring device] and monitoring supervised offenders, Officer Pace was unaware of the procedures used to monitor unsupervised offenders such as defendant, "because he doesn't deal with those" cases. "People out of Raleigh" monitor unsupervised offenders, and Officer Pace did not know "their requirements for checking their system."
....
At the time of defendant's remand hearing, the SBM program had been in effect for approximately ten years. However, the State failed to present any evidence of its efficacy in furtherance of the State's undeniably legitimate interests. The State conceded this point on 8 August 2017 during oral arguments before this Court. Defendant, however, presented multiple reports authored by the State and federal governments rebutting the widely held assumption that sex offenders recidivate at higher rates than other groups. Although the State faulted defendant for presenting statistics about supervised offenders, the State bears the burden of proving reasonableness at Grady hearings. Here, we are compelled to conclude that the State failed to carry its burden.
Id. at ----, --- S.E.2d at ----, slip op. at 18-20 (internal citation omitted).
Thus, because the State failed to present evidence that (1) SBM was an effective remedy in North Carolina to protect the public from recidivism by sex offenders; and (2) the defendant posed a "current threat of reoffending" such that SBM was necessary, we determined that the trial court had erred by finding the imposition of SBM in that case to be reasonable under the Fourth Amendment. Id. at ----, --- S.E.2d at ----, slip op. at 16-21.
This Court recently applied Grady II in State v. Griffin , --- N.C. App. ----, --- S.E.2d ---- (August 7, 2018) (No. COA17-386). In that case, the defendant pled guilty in 2004 to a first-degree sex offense with a child who lived in his household and was released from prison eleven years later. In 2015, the trial court held a "bring-back" hearing to determine whether the defendant was eligible for SBM. During this hearing, the State offered evidence that the defendant had presented a "moderate-low" risk of recidivism on his STATIC-99 assessment. Id. at ----, --- S.E.2d at ----, slip op. at 3. In addition, the defendant's probation officer testified that although the defendant had not completed the sex offender treatment that had been ordered he had not committed any new criminal offenses or violated the terms of his probation since being released from prison. Furthermore, at the SBM hearing, the probation officer described the "physical dimensions of the SBM tracking device, how it is worn, and its general function." Id. at ----, --- S.E.2d at ----, slip op. at 3. The State also submitted to the trial court a "Memorandum in Support of Reasonableness of Satellite Based Monitoring" in which it "cited only other court decisions, not evidence, and it did not attach empirical or statistical reports." Id. at ----, --- S.E.2d at ----, slip op. at 10. The trial court determined that the State's evidence coupled with the fact that the defendant had held a "position of trust" with the victim was sufficient to warrant the imposition of SBM for a period of thirty years. Id. at ----, --- S.E.2d at ----, slip op. at 4.
On appeal, we noted that the trial court had made no findings reflecting "whether [it] determined that Defendant's betrayal of trust or failure to complete or participate in [the sex offender treatment program] increased his likelihood of recidivism." Id. at ----, --- S.E.2d at ----, slip op. at 13. In determining whether the State had presented sufficient evidence of the reasonableness of SBM, we stated that "[d]ecisions from other jurisdictions ... holding that SBM is generally regarded as effective in protecting the public from sex offenders are not persuasive in light of this Court's binding decision in Grady II that the State must present some evidence to carry its burden of proving that SBM actually serves that governmental interest." Id. at ----, --- S.E.2d at ----, slip op. at 11. Thus, we reversed the trial court's SBM order because the State had failed to present sufficient evidence as to "the efficacy of the SBM program" that would support a finding that the warrantless search was reasonable under the Fourth Amendment and did not remand the case for a new SBM hearing. Id. at ----, --- S.E.2d at ----, slip op. at 10.
In the present case, the trial court made the following pertinent findings of fact in the SBM Order:
2. The Court has considered and received as evidence, State's Exhibit # 4, which is the risk assessment known as a "Population Report OTI-R Results for Inmate M. White" as completed by the Department of Adult Corrections on November 22, 2016. Further, the evidence shows that the assessment determines that the defendant registered a "Risk Score: 4" and a "Risk Level: 5" which militates toward imposition of the highest possible level of supervision of the defendant.
3. That some of the crimes committed against the minor victim involved "acts of penetration" of her sex organ.
4. The crimes were committed against the victim over a period of 2 years.
5. The crimes committed by the defendant included acts of "grooming" of the victim in order for the defendant to engage in sex acts with her.
6. The crimes were committed by the defendant in some instances by using the deception of the victim, the victim's parents, and staff of the public schools attended by the victim.
7. The crimes continued and contact with the victim continued despite repeated warnings and prohibitions made to the defendant by the supervisory staff of the public schools where the defendant was employed and by the victim's parents.
8. That the letters, notes, and emails presented as evidence and as authored by the defendant and sent to the victim show a pattern of compulsive, uncontrolled behavior. That the defendant's communications to the victim stated that she would "love" her and "be with [her] no matter what".
9. The defendant secretly provided electronic devices to the victim for the purpose of allowing continued secret contact and communication after being directed to cease contact with the victim.
10. That the defendant had applied to her body a tattoo with her name and the victim's name linked together.
11. The defendant was married with minor children during all times of the acts which constitute these offenses.
12. That the defendant's spouse became aware of the subject relationship and condoned and supported the sexual contact with the minor victim.
13. The defendant was a teacher in the public schools where she met and began her crimes with the victim. The victim was previously unknown to her.
14. The criminal contact occurred at the school, at the defendant's home, at the victim's home and secretly in public places including bathrooms.
15. The emotional damage to the victim in this case was and continues to be extreme requiring ongoing intervention and treatment.
16. The SBM monitoring does not prohibit the defendant from traveling or working nor does it prevent her from legally moving about as she wishes within the law of North Carolina. It simply records her whereabouts via a GPS signal to ensure that she is complying with state law.
17. The SBM monitoring device is a very small rubber type strap that weighs less than a pound and is secured at the ankle. It can be worn safely in the shower and even for non-extended periods in a pool.
18. "The SBM device can be used equally to establish any violation of the Defendant's whereabouts and future contact and to exonerate her from any claim of such violation. Further, that the findings of fact and conclusions of law as set forth in the "Convicted Sex Offender Permanent No Contact Order" (AOC-CR-620) issued by Judge Hudson at the time of the defendant's plea of guilty to the subject offenses are incorporated by reference here and that said order does not adequately protect the victim from future contact from the defendant and does not assuage the fear the victim has regarding such contact. Use of the SBM device as contemplated in this order will strengthen the objectives of the "Convicted Sex Offender Permanent No Contact Order" issued by Judge Hudson.
19. Given the compulsive and persistent nature of the criminality in these cases the Court finds that the risks of recidivism is high and outweighs any minimal intrusion into the defendant's privacy. The Court finds that given the risks to society, the compulsive behavior of this criminal conduct, the wide range of locations in which the illegal contact occurred, the harm to any future minors, the limited information and intrusion of the SBM, the Court finds that the incremental loss of privacy from having to wear the ankle monitor is outweighed by the value to society and the protection of its minors and therefore specifically finds that the search of the SBM in this case is reasonable.
The SBM Order also discussed decisions from other jurisdictions since Grady I where SBM had been upheld as a reasonable search. Based on these findings and the court's reliance on decisions from other jurisdictions, the trial court concluded that the imposition of SBM was reasonable under Grady I .
Defendant argues that Finding No. 2 is unsupported by the evidence presented at the hearing. We agree. Finding No. 2 states that Defendant's OTI-R results determined that Defendant "registered a 'Risk Score: 4' and a 'Risk Level: 5' which militates toward imposition of the highest possible level of supervision of the defendant ." (Emphasis added.) While the State's evidence did demonstrate that Defendant's OTI-R assessment resulted in a risk score of 4 and a risk level of 5, the evidence showed that such a low score placed Defendant in the "Minimal risk of re-arrest range." Thus, the implication that Defendant's OTI-R assessment supported the "imposition of the highest possible level of supervision" is unsupported by the evidence.[4]
Defendant contends that the State's evidence failed to show that (1) North Carolina's SBM program is effective at preventing recidivism; and (2) Defendant posed a threat of reoffending such that the imposition of SBM was reasonable. Even assuming arguendo that the State's evidence sufficiently demonstrated that Defendant posed a current threat of reoffending, we agree with Defendant that the State failed to meet its burden of introducing evidence regarding the efficacy of North Carolina's SBM program.
The only witness whose testimony touched on the effectiveness of SBM was Michael Teague, a psychologist who works with sex offenders in North Carolina. He testified on direct examination, in pertinent part, as follows:
[PROSECUTOR:] Okay. And have you been involved in any part of [the SBM] program yourself in any official way, in setting it up or how it monitors or works?
[TEAGUE:] I didn't have any hand in setting it up, but a number of my folks are in it. I've really grown to respect it. It's very effective. And I think it's an unbelievably constant reminder on the person who has the ankle bracelet that, you know, this is still an issue.
And I guess, like, the whole thing, how do we get people's attention? You know. Many times verbal statements are not the most effective.
But I think feeling that bracelet on one's ankle really gets their attention. Or if they're put in a location where they don't want to be, in jail or what have you, that gets their attention.
....
[PROSECUTOR:] Okay. So you think the satellite-based monitoring can be very effective in the treatment-in preventing some of the recidivism?
[TEAGUE:] Right, right. I think some people really need a lot of reminding, reaffirmation. And, also, people really complain about being on sex offender registry, which I understand. But it seems like it's almost a daily thing. You're on this registry, sheriff's department is following you, you've got to follow this. And I appreciate their discomfort with both the monitoring and the sex offender registry, but, I have to say, it does seem to keep their attention on what they're doing and what can happen if they break either, the satellite-based monitoring.
On cross-examination, Teague stated the following:
[DEFENSE COUNSEL:] Now, you indicated in your-you thought that SBM is effective in preventing recidivism?
[TEAGUE:] I think it is, yes, ma'am.
[DEFENSE COUNSEL:] Okay. Have you done any studies or documentations on that?
[TEAGUE:] No.
[DEFENSE COUNSEL:] Have you published any documentations on that?
[TEAGUE:] No.
[DEFENSE COUNSEL:] So that's just your personal feeling?
[TEAGUE:] I would say yes. Uh-huh.
(Emphasis added.)
In this appeal, Defendant argues that Teague's opinion testimony should not have been considered by the trial court because the State failed to provide Defendant notice of Teague's opinions and the bases for those opinions in advance of the SBM hearing. However, even assuming-without deciding-that the State was not required to provide this information to Defendant prior to the hearing, we nevertheless conclude that Teague's opinion testimony was insufficient under Grady II and Griffin to demonstrate the efficacy of North Carolina's SBM program.
As shown above, Teague's testimony essentially consisted of anecdotal statements regarding his experience working with sex offenders in the SBM program. While Teague stated his belief that SBM was "very effective," his testimony was not based on any empirical evidence, and he admitted that this statement was based on his own "personal feeling" regarding SBM.[5] As we stated in Griffin , "neither anecdote, common sense, nor logic, in a vacuum, is sufficient to carry the State's burden of proof." Griffin , --- N.C. App. at ----, --- S.E.2d at ----, slip op. at 10.
Indeed, the trial court made clear at the SBM hearing that Teague would not be permitted to testify as an expert witness.
[THE COURT:] [T]he Court does find specifically that the testimony being offered by State of North Carolina through this witness is relevant under Rule 401.
The Court does note that the witness is not being offered under Rule 702 as an expert, in view of the fact that he has not performed any evaluation as to this defendant and can offer no opinion as to her specific circumstances.
Additionally, with that said, State of North Carolina is not required to direct that a witness prepare a report, there's been no violation of General Statute Chapter 15A-903 or General Statute Chapter 1A regarding the Rules of Civil Procedure.
Court considers this testimony as fact witness testimony to provide the Court with information regarding the context within which this Court as a fact finder must make the decision.
To the extent that an appellate court might find that this testimony or any portion of it is not a fact witness testimony, Court does find that it is admissible under Rule 701.
Court specifically finds that the inferences offered by this witness are based on perceptions of the witness through the course of his employment and his training.
Court does find that it is helpful to a clear understanding of the testimony and as to a determination of a fact that is in issue.
Court, having made this determination, overrules the objection of the defendant. Testimony will be received.
Thus, Teague's statements were admitted as lay opinion testimony. See N.C. R. Evid. 701 ("If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue."); see also State v. Broyhill , --- N.C. App. ----, ----, 803 S.E.2d 832, 838 (2017) ("An expert's testimony relies upon scientific, technical or other specialized knowledge to provide insight beyond the conclusions that jurors can readily draw from their ordinary experience. Lay testimony, by contrast, is based on personal knowledge of facts which can be perceived by the senses." (internal citations and quotation marks omitted) ), disc. review denied , 370 N.C. 694, 811 S.E.2d 588 (2018).
We observe that even if the State had attempted to tender Teague as an expert witness on this issue, he would not have been qualified to give an expert opinion regarding the efficacy of North Carolina's SBM program. By his own admission, Teague had never researched the SBM program and did not purport to be relying on any empirical data or methodology in forming his opinions. See N.C. R. Evid. 702(a) (requiring that expert opinion be the "product of reliable principles and methods"). For all these reasons, Teague's testimony was inadequate to fulfill the State's burden of showing that North Carolina's SBM program was effective in preventing recidivism.[6]
The State further argues in its appellate brief that decisions from other jurisdictions in which SBM has been upheld are sufficient to demonstrate the efficacy of SBM in North Carolina. However, the State cannot rely upon such decisions as a substitute for its own lack of empirical evidence in order to fulfill its burden of proving that North Carolina's SBM program serves a legitimate governmental interest in preventing recidivism. See Griffin , --- N.C. App. at ----, --- S.E.2d at ----, slip op. at 11-12 ("Decisions from other jurisdictions ... holding that SBM is generally regarded as effective in protecting the public from sex offenders are not persuasive in light of this Court's binding decision in Grady II that the State must present some evidence to carry its burden of proving that SBM actually serves that governmental interest.").
Finally, because the State presented insufficient evidence to meet its burden, the State is not entitled to a new SBM hearing for the purpose of giving it a "second bite at the apple." See Griffin , --- N.C. App. at ----, --- S.E.2d at ----, slip op. at 14 (reversing SBM order without remand where "the State failed to present any evidence that SBM is effective to protect the public from sex offenders"); Grady II , --- N.C. App. at ----, --- S.E.2d at ----, slip op. at 20 (declining to remand because "the State will have only one opportunity to prove that SBM is a reasonable search of the defendant" (citation omitted) ); Greene , --- N.C. App. at ----, 806 S.E.2d at 345 (holding that "a case for satellite-based monitoring is the State's to make" and reversing order denying Defendant's motion to dismiss application for SBM).
We are bound by our decisions in Grady II and Griffin . See In re Civil Penalty , 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court."). Accordingly, as in Grady II and Griffin , we reverse the trial court's SBM Order.[7]
Conclusion
For the reasons stated above, we reverse the trial court's 16 August 2017 order.
REVERSED.
Report per Rule 30(e).
Judge INMAN concurs.
Judge DILLON dissents by separate opinion.

A pseudonym is used throughout this opinion for the protection of the minor child and for ease of reading.

The OTI-R assessment is a risk assessment utilized for female offenders that examines factors similar to those used on the STATIC-99 risk assessment for male offenders to determine their risk of reoffending.

Grady II was an appeal from the trial court's SBM order that was entered on remand from the United States Supreme Court's ruling in Grady I .

Indeed, the State does not dispute that this portion of the trial court's findings was erroneous.

We further note that Teague's testimony revealed a total lack of familiarity with regard to the efficacy of SBM as to female offenders-even on an anecdotal basis.

Given that the trial court did not mention Teague's testimony in its SBM Order, it is unclear what weight, if any, the court ultimately gave to his testimony.

Based on our holding, we need not address Defendant's alternative arguments.