IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-652

No. COA20-447

Filed 7 December 2021

Cumberland County, No. 18 CVS 5727

ELIZABETH ANN CLARK, Plaintiff,

v.

ADAM MATTHEW CLARK and KIMBERLY RAE BARRETT, Defendants.

Appeal by Defendant from judgment entered 17 September 2019 and order entered 30 October 2019 by Judge Mary Ann Tally in Cumberland County Superior Court. Heard in the Court of Appeals 12 May 2021.

*The Michael Porter Law Firm, by Michael R. Porter; and The Charleston Law Group, by Jose A. Coker and R. Jonathan Charleston, for Plaintiff-Appellee.*

*Tharrington Smith, LLP, by Jeffrey R. Russell and Evan B. Horwitz, for Defendant-Appellant.*

WOOD, Judge.

¶ 1     On September 17, 2019, a jury found Defendant, Adam Clark, ("Defendant Clark") liable for unlawful disclosure of private images, intentional infliction of emotional distress ("IIED"), and libel. Post-trial, Defendant Clark filed a motion for judgment notwithstanding the verdict ("JNOV"), and in the alternative, motion for new trial, which was denied. On appeal, Defendant Clark contends the trial court erred in admitting expert witness testimony; allowing Plaintiff, Elizabeth Clark,

("Plaintiff") to proceed with an IIED claim; and denying his post-trial motion. After careful review of the record and applicable law, we disagree.

## I. Factual and Procedural Background

On April 3, 2010, Plaintiff and Defendant Clark were married. At the time of their marriage, Defendant Clark held the rank of Captain in the United States Army. In or around May 2010, Plaintiff placed a personal advertisement on the website Craigslist. Through this advertisement, Plaintiff met a man with whom she had a sexual affair. According to Plaintiff, her extramarital affair lasted approximately ten months.

The couple remained together and attended several "marriage retreats," through the U.S. Army. During their marriage retreats, Plaintiff and Defendant Clark completed "exercises of trying to open up to your spouse, reconnect[ing] . . . . [T]hey go into forgiveness of things." Thereafter, the couple procreated two children in 2014 and 2015, respectively. In October 2015, Defendant Clark was promoted to Major.

In the spring of 2016, Defendant Clark attended Army training at Fort Belvoir, Virginia. While staying at Fort Belvoir, Defendant Clark met Defendant, Kimberly Barrett, MD ("Defendant Barrett"). Defendant Barrett held the rank of Lieutenant Colonel in the Army and knew Defendant Clark was married at the time. While at Fort Belvoir, Defendants Clark and Barrett stayed in barracks. The barracks were

"like a U shape and it was two floors and [Defendants Clark and Barrett] were [in] the same long building, but [Defendant Barrett] was down on the other end." While attending their training, Defendants Clark and Barrett "had been all alone in each other's rooms."

Defendant Barrett testified that her relationship with Defendant Clark started by Defendant Clark "helping [her] with homework or papers. Sometimes [she] had questions. There is a lot of acronyms in the -- field, but in the military, there are a lot of acronyms that [she] wasn't familiar with." While at Fort Belvoir, Defendant Clark told Defendant Barrett "he did not have a good relationship" with his wife.

While Defendant Clark completed his educational program at Fort Belvoir, Plaintiff "notice[d] a little bit of change" in her husband. Defendant Clark did not travel home to North Carolina to visit and "wasn't texting [Plaintiff] as often. One time [Plaintiff] couldn't get ahold of him and [she] tried calling his hotel room, [but he] wouldn't pick up when he was supposed to be in there . . . . He was short with [her] on the telephone."

Plaintiff used her cellphone to "trace or track" Defendant Clark's cellphone, during which time Defendant Clark's phone was "showing a different location from where his room was at." Defendant Clark's phone was "pinging . . . from the other end of the hall," from where Defendant Barrett was staying.

When Defendant Clark came home from Fort Belvoir for Independence Day,

Plaintiff discovered he "was texting a female. [She] found a number in his phone." When Plaintiff asked Defendant Clark who the female was, he replied, "I don't know what you're talking about." Finding the phone number caused Plaintiff "a lot of emotional distress." The couple argued about it, and Plaintiff experienced "stroke-like symptoms." Plaintiff was ultimately diagnosed with "[m]igraines and stress." Defendant Clark returned to Fort Belvoir shortly thereafter.

¶ 9 In September 2016, Plaintiff discovered text messages between Defendants Clark and Barrett, in which Defendant Clark sent Defendant Barrett a picture of his penis taken in Plaintiff and Defendant Clark's home. At the time she discovered the sexually explicit photograph, Defendant Clark had changed Defendant Barrett's name in his cellphone's contact information to "Jane S." Plaintiff knew "Jane S." was Defendant Barrett because she had matched the cellphone number of "Jane S." with that of Defendant Barrett.

¶ 10 On September 11, 2016, Plaintiff asked Defendant Clark if he "still had [Defendant Barrett's] number." Plaintiff threatened to call Defendant Barrett, and Defendant Clark "jumped up really fast and chased after [Plaintiff] as [Plaintiff] was dialing [Defendant Barrett's] number." Plaintiff threatened to ask Defendant Barrett if she and Defendant Clark were having an extramarital affair. Because of this interaction, the couple fought, and Defendant Clark left their marital home.

¶ 11 Although Plaintiff and Defendant Clark separated on September 11, 2016, the

couple attempted reconciliation by maintaining an emotionally and sexually intimate relationship. On March 17, 2017, Plaintiff and Defendant Clark executed a separation agreement, in which Defendant Clark agreed to pay $1,850 in monthly child support to Plaintiff. The separation agreement was drafted by Defendant Clark's attorney, and Plaintiff was not represented by independent counsel at the time.

¶ 12        Throughout June and July 2017, Plaintiff and Defendant Clark engaged in sexual intercourse and recorded themselves doing so. Also in July 2017, Defendant Clark and Defendant Barrett conceived a child together through *in vitro* fertilization. Defendant Clark continued to maintain an intimate and sexual relationship with both his wife and with his paramour during this time. In August 2017, Defendant Clark was located in Boston, Massachusetts for additional training. Plaintiff attempted to videocall Defendant Clark through Facetime, but Defendant Clark did not answer. When Defendant Clark did not answer, Plaintiff "sent him a topless photo." Plaintiff did not send the topless photograph to anyone else.

¶ 13        In September 2017, Plaintiff and Defendant Clark stopped having sexual intercourse. Around this time, Defendant Clark began complaining about the amount he paid to Plaintiff in child support. In October 2017, Plaintiff and Defendant Clark exchanged text messages, in which Plaintiff sent Defendant Clark "a picture of female genitalia." Around that same time, Plaintiff discovered Defendant Barrett was

pregnant with Defendant Clark's child.[1]

In January 2018, Plaintiff discovered a Craigslist advertisement and believed it to be about herself. The advertisement stated,

> Liz is super hot! Shows you what plastic surgeons and eating disorders can do for you in 2018. There's a reason she's been divorced twice and can't take care of her kids. She's a plaything, nothing more. Hope you fellas are wearing condoms, she's got herpes.

Plaintiff believed Defendant Clark posted the advertisement, because he "always said [she] had an eating disorder and when [they] started not getting along, he said that [she] didn't take care of [her] children and [she] was a bad mother." Plaintiff responded to the advertisement, stating that she knew Defendant Clark posted it. Whomever posted the advertisement denied being Defendant Clark. However, when Plaintiff sent insulting language to the poster of the advertisement, Defendant Clark sent Plaintiff a text message inquiring as to why he received such language.

In the text message, Defendant Clark included a "screenshot" of the message he received. Plaintiff observed that the message was sent to an email address with the username "elizabethclark0403." Plaintiff did not use an email address with that username but attempted to log into the email account. When Plaintiff attempted to do so, the "recovery email" matched that of Defendant Clark's personal email address.

---

[1] Defendants Clark and Barrett had a child together on March 7, 2018.

¶ 16        In March 2018, Plaintiff began interacting with Defendant Clark, who was using the alias "Brian Bragg" on the social networking platform, Kik.[2]  The Brian Bragg[3] account sent Plaintiff the photograph of her nude breasts, saying, "Saw this floating around the internet in the Fayetteville chat rooms just letting you know." "Brian Bragg" also stated the image was "all over the place," and that he hoped Plaintiff "[slept] well knowing [her] fun bags [were] hanging out there for the world to see."

¶ 17        In May 2018, Plaintiff discovered a Facebook "weight loss" advertisement depicting Plaintiff.  The advertisement was composed of a post-pregnancy photograph of Plaintiff next to the photograph of Plaintiff's nude breasts.  Prior to Plaintiff finding the advertisement, "Brian Bragg" had threatened to find and post Plaintiff's post-pregnancy photographs on Kik.

¶ 18        Throughout 2018, Plaintiff's friends and co-workers contacted her when they saw "Liz Clark" profiles, using a photograph of Plaintiff as a profile picture, in Kik chatrooms soliciting "no strings attached sex."  Kik business records revealed that the "Liz Clark" Kik profiles could be traced to an IP address that matched the IP address of Defendants Clark and Barrett's residence.

---

[2] When asked if Defendant Clark used the alias "Brian Bragg," Defendant Clark pled the Fifth Amendment.

[3] Plaintiff believed "Brian Bragg" was Defendant Clark, as the "Brian Bragg" account used a photograph that Plaintiff took of Defendant Clark as a profile picture.

When Plaintiff's friends and co-workers notified her that they saw the saw "Liz Clark" Kik profiles, she "was extremely embarrassed" and her "heart started racing." Plaintiff also received photographs from "Brian Bragg" depicting herself and her vehicle. Attached to these photographs were messages discussing how people were following Plaintiff. One message from "Brian Bragg" stated, "We are going to continue doing everything in our power to make your life miserable."

In August 2018, Plaintiff brought the instant action, asserting claims against both Defendants Clark and Barrett for libel *per se*; intentional and negligent infliction of emotional distress; and a violation of N.C. Gen. Stat. § 14-190.5A, a statute providing criminal sanctions for what is commonly known as "revenge porn." Plaintiff asserted additional causes of action against Defendant Barrett for alienation of affection and criminal conversation. In April 2019, Defendant Clark was arrested for stalking and cyberstalking Plaintiff in violation of N.C. Gen. Stat. §§ 14-277.3(A)(c) and 14-196.3.

In July 2019, the Cumberland County Superior Court barred the use of expert witness testimony in the civil actions filed by Plaintiff based upon a motion filed by Defendants Clark and Barrett to strike Plaintiff's tardy designation of an expert witness.

The case proceeded to trial in August 2019. During trial, Derek Ellington ("Ellington") was permitted to testify. Ellington is a digital forensics examiner in

Cumberland County. During Ellington's testimony, he laid the foundation for the entry of a flash drive containing nearly 32,000 files. Ellington preserved the files from Plaintiff's electronic devices, and social media and email accounts. The data Ellington gathered and saved demonstrated that Plaintiff had only sent the "topless photo" of herself to Defendant Clark.

¶ 23     After a jury trial, the trial court entered judgment against Defendant Clark for libel *per se*, unlawful disclosure of private images/revenge porn, and IIED on September 17, 2019. Plaintiff was awarded $1,510,000.00 in compensatory damages and $500,000.00 in punitive damages. Defendant Clark filed a motion for judgment notwithstanding the verdict ("JNOV"), and in the alternative, a motion for a new trial on September 26, 2019. The trial court denied Defendant Clark's motions on October 30, 2019. Defendant Clark appeals from both the September 17, 2019 judgment and the October 30, 2019 order denying his post-trial motion.

## II.     Discussion

¶ 24     Defendant Clark raises several arguments on appeal. Each will be addressed in turn.

### A. Ellington's Testimony

¶ 25     Defendant Clark first contends the trial court erred "by admitting evidence and testimony from an expert witness who was not qualified as such." We disagree.

#### 1. *Standard of Review*

¶ 26        As a preliminary matter, the parties dispute the proper appellate standard of review. Defendant Clark contends the appropriate standard of review is *de novo*, because "[w]here the plaintiff contends the trial court's decision is based on an incorrect reading and interpretation of the rule governing admissibility of expert testimony, the standard of review on appeal is *de novo*." *Cornett v. Watauga Surgical Grp., P.A.*, 194 N.C. App. 490, 493, 669 S.E.2d 805, 807 (2008) (citations omitted). Conversely, Plaintiff asks this Court to review the admission of Ellington's testimony for an abuse of discretion. Rule 104(a) of our rules of evidence provides that "preliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court." N.C. Gen. Stat. § 8C-1, Rule 104(a) (2020). Decisions made under Rule 104(a) are addressed to the sound discretion of the trial court. *See State v. Fearing*, 315 N.C. 167, 174, 337 S.E.2d 551, 554 (1985).

¶ 27        After careful review of the applicable law, we review *de novo* whether Ellington testified as an expert witness. *See State v. Broyhill*, 254 N.C. App. 478, 488, 803 S.E.2d 832, 839 (2017) (citation omitted); *see also State v. Jackson*, 258 N.C. App. 99, 107, 810 S.E.2d 397, 402 (2018) (noting that the Court applied a *de novo* standard of review "because determining whether the State's experts' testimonies constituted expert opinions . . . was a question" of law.) (citing *State v. Davis*, 368 N.C. 794, 797-98, 785 S.E.2d 312, 314-15 (2015)). "Under a *de novo* review, the court considers the

matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and internal quotation marks omitted). However, whether the trial court erroneously admitted Ellington's testimony is reviewed for an abuse of discretion. *See Crocker v. Roethling*, 363 N.C. 140, 143, 675 S.E.2d 625, 628-29 (2009) (citation omitted); *see also State v. Turbyfill*, 243 N.C. App. 183, 185-86, 776 S.E.2d 249, 252 (2015) (citation omitted). "Abuse of discretion results where the Court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Turbyfill*, 243 N.C. App. at 185-86, 776 S.E.2d at 252 (citation omitted).

### 2. *Whether Ellington's Testimony Constitutes Expert Testimony*

The parties next dispute whether Ellington testified as an expert or gave a lay opinion. "Our Supreme Court . . . explained the threshold difference between expert opinion and lay witness testimony." *Broyhill*, 254 N.C. App. at 485, 803 S.E.2d at 839 (citing *Davis*, 368 N.C. at 798, 785 S.E.2d at 315). "[W]hen an expert witness moves beyond reporting what he saw or experienced through his senses, and turns to interpretation or assessment 'to assist' the jury based on his 'specialized knowledge,' he is rendering an expert opinion." *Davis*, 368 N.C. at 798, 785 S.E.2d at 315 (quoting N.C. Gen. Stat § 8C-1, Rule 702(a)). "Ultimately, 'what constitutes expert opinion testimony requires a case-by-case inquiry' through an examination of 'the testimony

as a whole and in context.'" *Broyhill*, 254 N.C. App. at 485, 803 S.E.2d at 839 (quoting *Davis*, 368 N.C. at 798, 785 S.E.2d at 315).

¶ 29        Here, Ellington testified about the general process for making a forensic or digital copy of electronic devices and specifically testified as to how he made a copy of Plaintiff's electronic devices. Ellington's testimony laid the foundation[4] for a flash drive containing files from Plaintiff's devices, demonstrating Plaintiff did not send the "topless photo" to anyone other than Defendant Clark. A review of Ellington's testimony reveals that he testified not as an expert, but as a lay witness. Ellington testified as to what he "saw or experienced" in creating copies of Plaintiff's devices and accounts. He did not interpret or assess the devices or accounts but explained the process he used for Plaintiff's devices was one that he did daily.

¶ 30        Presuming *arguendo* Ellington testified as an expert, Defendant Clark failed to sufficiently demonstrate prejudice. *See State v. Babich*, 252 N.C. App. 165, 172, 797 S.E.2d 359, 364 (2017) ("Where it does not appear that the . . . admission of evidence played a pivotal role in determining the outcome of the trial, the error is harmless.") (quoting *State v. Mason*, 144 N.C. App. 20, 27-28, 550 S.E.2d 10, 16 (2001)). Here, Plaintiff testified about the text messages, emails, and social media messages and postings. Ellington's testimony was not "pivotal" in determining

---

[4] Defendant Clark does not argue that the flash drive was improperly authenticated under N.C. Gen. Stat. § 8C-1, Rule 901.

whether Defendants Clark and Barrett posted Plaintiff's nude breasts on the internet; rather, it corroborated Plaintiff's testimony that she sent the topless photograph to Defendant Clark. Therefore, we find no error in the trial court's decision to allow Ellington to testify.

**B. IIED Claims**

Next, Defendant Clark contends the trial court erred by allowing Plaintiff's IIED claim to proceed "when the conduct is subsumed by other causes of action," and by denying Defendant Clark's post-trial motion "because there was insufficient evidence for the claim of IIED to be submitted to the jury." We disagree.

Whether Plaintiff's IIED cause of action is subsumed by her other asserted torts is a question of law reviewed *de novo*. *See Piazza v. Kirkbride*, 246 N.C. App. 576, 579, 785 S.E.2d 695, 698 (2016), *modified*, 372 N.C 137, 827 S.E.2d 479 (2019). "The standard of review of a ruling entered upon a motion for judgment notwithstanding the verdict is 'whether, upon examination of all the evidence in the light most favorable to the nonmoving party, and that party being given the benefit of every reasonable inference drawn therefrom, the evidence is sufficient to be submitted to the jury.' " *Everhart v. O'Charley's Inc.*, 200 N.C. App. 142, 148-49, 683 S.E.2d 728, 735 (2009) (quoting *Branch v. High Rock Realty, Inc.*, 151 N.C. App. 244, 249-50, 565 S.E.2d 248, 252 (2002)). Generally, "[i]f there is more than a scintilla of evidence supporting each element of the nonmoving party's claim, the motion for

directed verdict or JNOV should be denied." *Horner v. Byrnett*, 132 N.C. App. 323, 325, 511 S.E.2d 342, 344 (1999) (citation omitted); *see also Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C. App. 168, 172, 506 S.E.2d 267, 270 (1998). "A scintilla of evidence is defined as very slight evidence." *Hayes v. Waltz*, 246 N.C. App. 438, 442-43, 784 S.E.2d 607, 613 (2016).

¶ 33 In determining whether the trial court erred in denying a JNOV, "we must take the plaintiff's evidence as true, and view all of the evidence in the light most favorable to him/her, giving him/her the benefit of every reasonable inference which may be legitimately drawn therefrom, with conflicts, contradictions, and inconsistencies being resolved in the plaintiff's favor." *Watson v. Dixon*, 130 N.C. App. 47, 52, 502 S.E.2d 15, 19 (1998) (citations and internal quotation marks omitted).

### 3. *Election of Remedies*

¶ 34 Defendant Clark contends the trial court erred in permitting Plaintiff to pursue her claim for IIED, "when the conduct is subsumed by other causes of action." Defendant Clark specifically contends that Plaintiff cannot recover under both IIED and another tort for the same conduct. Plaintiff argues Defendant Clark failed to preserve this argument for appellate review, as it "was never raised in [Defendant] Clark's post-trial motions."

¶ 35 "One is held to have made an election of remedies when he chooses with

knowledge of the facts between two inconsistent remedial rights." *Lamb v. Lamb*, 92 N.C. App. 680, 685, 375 S.E.2d 685, 687 (1989) (citation omitted). "The purpose of the doctrine of election of remedies is to prevent more than one redress for a single wrong." *Triangle Park Chiropractic v. Battaglia*, 139 N.C. App. 201, 204, 532 S.E.2d 833, 835 (2000) (citation omitted). The doctrine of "[e]lection of remedies is an affirmative defense which must be pleaded by the party relying on it." *North Carolina Federal Sav. & Loan Ass'n v. Ray*, 95 N.C. App. 317, 323, 382 S.E.2d 851, 856 (1989) (citations omitted).

¶ 36        While Defendant Clark contends Plaintiff's IIED claim should not have been submitted to a jury because it was subsumed by other causes of action, Defendant Clark did not raise the defense of election of remedies at trial or in his post-trial motions. Therefore, he may not raise this argument on appeal. *Id.*; *see also State ex rel. Easley v. Rich Food Servs., Inc.*, 139 N.C. App. 691, 704, 535 S.E.2d 84, 92-93 (2000).

### *4. Sufficiency*

¶ 37        Next, Defendant Clark contends the trial court erred in denying his post-trial motions because Plaintiff did not present evidence to support each element of IIED. We disagree.

¶ 38        "To state a claim for intentional infliction of emotional distress, a plaintiff must allege: '(1) extreme and outrageous conduct (2) which is intended to cause and does

cause (3) severe emotional distress to another." *Norton v. Scotland Mem'l Hosp., Inc.*, 250 N.C. App. 392, 397, 793 S.E.2d 703, 708 (2016) (citation omitted). "Extreme and outrageous conduct is defined as conduct that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citation omitted).

### a. Severe Emotional Distress

¶ 39 Defendant Clark first argues Plaintiff failed to present evidence that she suffered from "severe emotional distress." We disagree.

¶ 40 "[T]he term 'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Waddle v. Sparks*, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992) (citation and emphasis omitted). However, severe emotional distress does not require medical expert testimony. *Williams v. HomEq Serv. Corp.*, 184 N.C. App. 413, 419, 646 S.E.2d 381, 385 (2007). Testimony of a plaintiff's "friends, family, and pastors can be sufficient to support a claim. . . ." *Id.* (citations omitted).

¶ 41 Here, Plaintiff testified at trial that she cried hysterically, hyperventilated, and sought out a counselor at a local clinic in response to the conduct of Defendants Clark and Barrett. One of Plaintiff's friends testified that Plaintiff was "very

emotionally distraught and crying" on a weekly basis and that Plaintiff experienced anxiety. Although Plaintiff did not attend counseling for her anxiety on a regular basis, she testified this was out of fear that such treatment would negatively impact her probability of maintaining shared custody of her children. Taking the evidence in the light most favorable to Plaintiff, we hold there was more than a scintilla of evidence she suffered severe emotional distress as a result of the conduct of Defendants Clark and Barrett.

*b. Causation*

Defendant Clark further contends the trial court erred in denying his post-trial motion because Plaintiff failed to show a causal link between Defendant Clark's conduct and Plaintiff's emotional harm. We disagree.

Intentional infliction of emotional distress requires outrageous conduct that is intended to cause and does cause severe emotional distress. *See Hogan v. Forsyth Country Club Co.*, 79 N.C. App. 483, 487-88, 340 S.E.2d 116, 119-20 (1986) (citation omitted).

> The tort may also exist where defendant's actions indicate a reckless indifference to the likelihood that they will cause severe emotional distress. Recovery may be had for the emotional distress so caused and for any other bodily harm which proximately results from the distress itself.

*Id.* (citation omitted).

Defendant Clark argues Plaintiff failed to show his conduct caused Plaintiff

severe emotional distress because Plaintiff experienced "stroke-like symptoms" and was diagnosed with "migraines and stress" prior to the complained of conduct to support her IIED claim. While the trial court noted Plaintiff's emotional distress included "stroke-like symptoms," it did not solely rely on such symptoms in finding Plaintiff produced evidence of severe emotional distress. Specifically, the trial court noted, "that Defendant Clark's conduct did cause severe emotional distress to Plaintiff in the form of anxiety and also physical manifestations, including stroke like symptoms." Plaintiff presented evidence that Defendant Clark acted with a disregard to Plaintiff's emotional state and that there was a high possibility of emotional distress in that, Defendant Clark posed as "Brian Bragg" and engaged in "long-term electronic harassment of . . . Plaintiff to include, inter alia, calling the Plaintiff disparaging names, including 'whore' and 'white trash' "; Defendant Clark created a fake Kik profile and posed as Plaintiff, causing the profile to become a member in various chatrooms intended for "no strings attached sex"; and Defendant Clark posted libelous social media postings about Plaintiff on Craigslist and Facebook.

¶ 45        There is no dispute Plaintiff experienced "stroke-like symptoms" prior to the parties' execution of the separation agreement. Plaintiff experienced anxiety, hyperventilation, and other emotional distress as a result of the conduct of Defendants Clark and Barrett. Plaintiff testified this was caused by Defendants Clark and Barrett messaging her that they would do "everything in [their] power to

make [her] life miserable" and by discovering fake "Liz Clark" Kik profiles soliciting "no strings attached" sexual intercourse. Accordingly, we hold there was more than a scintilla of evidence to find a causal link between the complained of conduct and Plaintiff's emotional distress.

### c.  *Outrageous Conduct*

¶ 46    Next, Defendant Clark argues Plaintiff failed to present sufficient evidence of extreme and outrageous conduct because trading mere insults does not give rise to a claim of IIED.  We disagree.

¶ 47    "[T]he initial determination of whether conduct is extreme and outrageous is a question of law," to be determined by the court.  *Johnson v. Bollinger*, 86 N.C. App. 1, 6, 356 S.E.2d 378, 381 (1987) (citing *Briggs v. Rosenthal*, 73 N.C. App. 672, 676, 327 S.E.2d 308, 311, *cert. denied*, 314 N.C. 114, 332 S.E.2d 479 (1985)). Conduct is considered extreme or outrageous "when a defendant's conduct exceeds all bounds usually tolerated by decent society." *Watson*, 130 N.C. App. at 52, 502 S.E.2d at 19 (citation omitted).  Conduct has also been deemed "extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chidnese v. Chidnese*, 210 N.C. App. 299, 316, 708 S.E.2d 725, 738 (2011) (internal quotation marks and citation omitted).

The  liability  clearly  does  not  extend  to  mere  insults,

> indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion . . . .

*Id.* (citation omitted). In *Watson v. Dixon*, this Court found sufficient evidence of "extreme and outrageous behavior" where the defendant "harass[ed]" the plaintiff, and "frightened and humiliated [the plaintiff] with cruel practical jokes, which escalated to obscene comments and behavior of a sexual nature . . . ." 130 N.C. App. at 53, 502 S.E.2d at 20.

¶ 48    Viewing the evidence in the light most favorable to Plaintiff, and taking that evidence as true, the evidence tends to show that Defendant Clark began harassing and stalking Plaintiff after the date of separation; frightened Plaintiff by stating, "We are going to continue doing everything in our power to make your life miserable"; and humiliated Plaintiff by posting advertisements and photographs of Plaintiff online, containing Plaintiff's personal information. Thus, we hold the trial court did not err in denying Defendant Clark's JNOV, as Plaintiff presented more than a scintilla of evidence of "extreme and outrageous behavior." *See Watson*, 130 N.C. App. at 53, 502 S.E.2d at 20 (citing *Denning-Boyles v. WCES, Inc.*, 123 N.C. App. 409, 473 S.E.2d 38 (1996); *Brown v. Burlington Industries, Inc.*, 93 N.C. App. 431, 378 S.E.2d 232 (1989),

*disc. review improvidently allowed*, 326 N.C. 356, 388 S.E.2d 769 (1990); *Hogan*, 79 N.C. App. 483, 340 S.E.2d 116).

**C. Plaintiff's Libel Claim**

¶ 49 Next, Defendant Clark contends the trial court erred in denying his post-trial motion with respect to Plaintiff's libel claim. Defendant Clark brings forth two arguments with respect to Plaintiff's claim for libel *per se*; namely, whether Plaintiff failed to prove the libelous statements were published and whether two libelous publications were properly authenticated.

¶ 50 "North Carolina law recognizes three classes of libel . . . . [P]ublications obviously defamatory . . . are called libel *per se*." *Daniels v. Metro Magazine Holding Co., L.L.C.*, 179 N.C. App. 533, 538, 634 S.E.2d 586, 590 (2006) (citation omitted). Libel *per se* is

> a publication by writing, printing, signs or pictures which, when considered alone without innuendo, colloquium or explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt, or disgrace.

*Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 317-18, 312 S.E.2d 405, 409 (1984) (citation omitted). "It is an elementary principle of law that there can be no libel without a publication of the defamatory matter." *Satterfield v. McLellan Stores Co.*, 215 N.C. 582, 584, 2 S.E.2d 709, 711 (1939). "To constitute a publication, such

as will give rise to a civil action, there must be a communication of the defamatory matter to some third person or persons." *Id.* (citation omitted).

### a. Publication

Defendant Clark first contends Plaintiff failed to present sufficient "evidence that Defendant Clark publicized the alleged content to Facebook or Craigslist." We disagree.

There are two libelous electronic social media postings at issue: a Craigslist advertisement and the Facebook "weight loss" advertisement. Craigslist itself is a website in which individuals can post personal advertisements for third-party viewing. Plaintiff testified she discovered the Craigslist advertisement, and presumably, other individuals observed the personal advertisement as well. Thus, there was sufficient evidence that the Craigslist advertisement was published.

Plaintiff further testified that she responded to the Craigslist ad online with an insulting message directed at Defendant Clark. Defendant Clark, in response, text messaged a picture of Plaintiff's message, inquiring as to why she had sent him such a message. From Defendant Clark's response, Plaintiff was able to see that the "poster" of the personal ad used the email "elizabethclark0403." This was not Plaintiff's personal email, but she attempted to log into the email account. Because Plaintiff did not have the login information for "elizabethclark0403," she attempted

to "recover" the login information through Google's email system.[5]  Upon doing so, Plaintiff discovered the "recovery email" for "elizabethclark0403" was Defendant Clark's personal email address. Therefore, we hold there was more than a scintilla of evidence that Defendant Clark published the Craigslist advertisement.

¶ 54     Defendant Clark further argues there was insufficient evidence that Defendant Clark published the Facebook "weight loss" advertisement.  We disagree.

¶ 55     Plaintiff testified a third party sent Plaintiff the Facebook advertisement, establishing that the ad was indeed published.  Plaintiff further testified that both photographs used in the advertisement were in the sole possession of Defendant Clark.  Further, "Brian Bragg" mentioned Plaintiff's post-pregnancy photographs and that he would "make sure to find" such photographs shortly before the Facebook advertisement was posted.  As Plaintiff presented more than a scintilla of evidence that Defendant Clark published the Facebook advertisement, we find no error.

### b. *Authentication*

¶ 56     Defendant Clark next argues the trial court erred by denying his motion for JNOV because Plaintiff did not properly authenticate the libelous postings.  We

---

[5] If a "gmail" or Google email account holder forgot their password or username, they can recover their Google account by entering certain information such as their username, their "recovery" email address, or a phone number. *See How to recover your Google account or Gmail*, https://support.google.com/accounts/answer/7682439?hl=en.

A "recovery email" is a separate email account Google account holders can use to recover their lost username or password.

disagree.

¶ 57        Under Rule 901 of our evidentiary rules, "[t]he requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C. Gen. Stat. § 8C-1, Rule 901(a) (2020). Rule 901(b) provides examples of authentication methods that satisfy the requirements of Subsection (a), including testimony of a witness with knowledge "that a matter is what it is claimed to be." N.C. Gen. Stat. § 8C-1, Rule 901(b)(1). Here, Plaintiff authenticated the libelous electronic postings through her own testimony. Plaintiff testified that she personally saw the advertisement, recognized it to be about her, and made a copy of the ad. Likewise, Plaintiff authenticated the Facebook advertisement by testifying the advertisement was sent directly to her by a third party and the advertisement exhibits characteristics of Facebook as a social media site, in that it demonstrates where viewers can interact with the posting. Accordingly, we hold Plaintiff sufficiently authenticated each libelous posting through first-hand knowledge under Rule 901(b)(1).

**D.  N.C. Gen. Stat. § 14-190.5A**

¶ 58        Next, Defendant Clark contends the trial court erred by denying his post-trial motion as there was insufficient evidence for the issue of "revenge porn" to be submitted to the jury. Specifically, Defendant Clark argues Plaintiff failed to show that he shared an image of "intimate parts" under N.C. Gen. Stat. § 14-190.5A.

¶ 59        N.C. Gen. Stat. § 14-190.5A prohibits the "disclosure of private images" and is

commonly known as the "revenge porn" statute. Section 14-190.5A provides,

> A person is guilty of disclosure of private images if all of
> the following apply:
>
> (1) The person knowingly discloses an image of another
> person with the intent to do either of the following:
>
>> a. Coerce, harass, intimidate, demean, humiliate, or
>> cause financial loss to the depicted person.
>>
>> b. Cause others to coerce, harass, intimidate, demean,
>> humiliate, or cause financial loss to the depicted person.
>
> (2) The depicted person is identifiable from the disclosed
> image itself or information offered in connection with the
> image.
>
> (3) The depicted person's intimate parts are exposed or the
> depicted person is engaged in sexual conduct in the
> disclosed image.
>
> (4) The person discloses the image without the affirmative
> consent of the depicted person.

N.C. Gen. Stat. § 14-190.5A(b) (2020). "Intimate parts" is statutorily defined as "[a]ny

of the following naked human parts: (i) male or female genitals, (ii) male or female

pubic area, (iii) male or female anus, or (iv) the nipple of a female over the age of 12."

N.C. Gen. Stat. § 14-190.5A(a)(3).

¶ 60        Defendant Clark argues in his brief that the issue of revenge porn should not

have been submitted to the jury, because the Facebook "weight loss" advertisement

had a star emoji[6] covering one of Plaintiff's nipples and did not violate the "revenge porn" statute or Facebook's "Community Standards." However, Defendant Clark ignores that the topless photograph that appeared on Facebook with a star is the same photograph shared through Kik, sans star emoji. We hold that there was sufficient evidence as to each element contained within the "revenge porn" statute such that the trial court did not err in submitting the issue to the jury.

**E. Separation Agreement & Property Settlement**

In his sixth argument on appeal, Defendant Clark contends that "[t]o the extent that the factual basis for any of Plaintiff's claims against Defendant Clark occur prior to March 16, 2017, they are waived by a provision in the parties' separation agreement entitled 'Mutual Release.' "

The "Mutual Release" provision provides,

> [E]ach party does hereby release and discharge the other of and from all causes of action, claims, rights or demands whatsoever, at law or in equity, which either of the parties ever had or now has against the other, known or unknown, by reason of any matter, cause, or thing up to the date of the execution of this agreement, except the cause of action for divorce based upon the separation of the parties. It is the intention of the parties that henceforth there shall be, as between them, only such rights and obligations as are specifically provided for in this agreement, the right of

---

[6] The Merriam-Webster dictionary defines an "emoji" as "any of various small images, symbols, or icons used in text fields in electronic communication (such as text messages, email, and social media) to express the emotional attitude of the writer, convey information succinctly, communicate a message playfully without using words, etc."

> action for divorce, and such rights and obligations as are
> specifically provided for in any deed or other instrument
> executed contemporaneously or in connection herewith.

However, Plaintiff's claims arise from Defendant Clark's conduct that occurred after the parties executed the agreement in March 2017. Plaintiff's claims arise from Defendant Clark's posting of libelous statements and explicit photographs in 2018. Therefore, this assignment of error is without merit.

**F. Damages**

In Defendant Clark's final argument on appeal, he contends the trial court erred in denying his motion for JNOV "because the damages awarded to Plaintiff were improper and not supported by the evidence." We disagree.

The trial court has discretion to grant a new trial where the jury awards "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice." N.C. R. Civ. P. 59(a)(6). However,

> our appellate courts should place great faith and
> confidence in the ability of our trial judges to make the
> right decision, fairly and without partiality, regarding the
> necessity for a new trial. Due to their active participation
> in the trial, their first-hand acquaintance with the evidence
> presented, their observances of the parties, the witnesses,
> the jurors and the attorneys involved, and their knowledge
> of various other attendant circumstances, presiding judges
> have the superior advantage in best determining what
> justice requires in a certain case.

*Worthington v. Bynum*, 305 N.C. 478, 487, 290 S.E.2d 599, 605 (1982). "Consequently, an appellate court should not disturb a Rule 59 order unless it is

reasonably convinced by the cold record that the trial judge's ruling probably amounted to a substantial miscarriage of justice." *Id.*

¶ 65 Here, there is no evidence of a "substantial miscarriage of justice." Although the jury awarded $1,000,0000 in damages for libel *per se*, libel *per se* allows for presumed damages for pain and suffering without a showing of special damages. *See Iadanza v. Harpe*r, 169 N.C. App. 776, 779-80, 611 S.E.2d 217, 221 (2005).

¶ 66 Defendant Clark also contends that the award of punitive damages was inappropriate as the trial court failed to receive evidence or make findings of fact concerning all of the factors enumerated in N.C. Gen. Stat. § 1D-35. However, the jury is not mandated to consider all factors enumerated in Section 1D-35. The plain language of the statute allows the trier of fact to consider such factors, but it is not a requirement. Accordingly, we hold the trial court did not err in denying Defendant Clark's post-trial motion with respect to damages.

## III. Conclusion

¶ 67 After careful review of the record and applicable law, we conclude there was no error at trial. Additionally, we hold the trial court did not err in denying Defendant Clark's motion for JNOV. Plaintiff presented more than a scintilla of evidence in support of each asserted cause of action. We further hold the trial court did not err in denying Defendant Clark's post-trial motion because the separation agreement is inapplicable to the complained of conduct and the damages awarded to

Plaintiff were proper.

NO ERROR AND AFFIRMED.

Judges TYSON and HAMPSON concur.